2021 IL App (1st) 181729-U

THIRD DIVISION
December 22, 2021

No. 1-18-1729

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 02061 |
| | ) | |
| JOSE RODRIGUEZ, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Remanded for third-stage postconviction hearing on ineffective-assistance claim, where direct-appeal counsel allegedly advised dismissal of appeal to minimize risk of IDOC discovering its error in defendant's initial release-date calculation. Dismissal of remaining claims affirmed, where trial counsel not ineffective for failing to assert defense of dwelling or for depriving defendant of jury trial.

¶ 2   Defendant Jose Rodriguez was convicted after a bench trial of the second-degree murder of Gino Kuelbs and the aggravated battery with a firearm of John Ebler. After filing a notice of appeal, he agreed to voluntarily dismiss his direct appeal. Defendant later filed a postconviction petition, in which he alleged that he dismissed his appeal based on the unreasonable advice that he received from his appointed counsel on direct appeal. According to defendant, direct-appeal counsel advised him that pursuing an appeal would make it (more) likely that IDOC would

discover and correct its miscalculation of his release date, in its own records, and thus deprive him of the 3 ½-year windfall that he stood to gain. Defendant further alleged that his trial counsel was ineffective for two reasons—for failing to assert an affirmative defense of dwelling, and for refusing to honor defendant's request for a jury trial.

¶ 3     The circuit court dismissed all three of these claims at the second stage of postconviction proceedings. We reverse the dismissal of defendant's claim of ineffective assistance of appellate counsel and remand that claim for an evidentiary hearing. We affirm the dismissal of defendant's claims of ineffective assistance of trial counsel.

¶ 4                                      BACKGROUND

¶ 5     At 4:30 a.m., on the night of the shooting, Ebler and Kuelbs arrived on defendant's block in a burgundy van. Ebler's sister Concetta, and a friend, Ascencion Acuna, were in the van with them. Defendant saw the van driving through the alley on the video feed from his home security system. He retrieved a .44 magnum from his attic, went outside, and opened fire, killing Kuelbs and striking Ebler. Defendant admitted from the start that he shot them, cooperated fully with the investigation, and promptly turned over his gun and the security footage when the police arrived on the scene.

¶ 6     The State charged him with first-degree murder, attempt murder, and aggravated battery with a firearm. Defendant elected a bench trial. The key factual dispute was whether he acted in self-defense and/or defense of others (the others being seven family members who were inside at the time). Defendant believed that Ebler and Kuelbs were coming to set fire to his house.

¶ 7     The evidence strongly suggested that defendant and the victims were mired in an ongoing gang conflict. Defendant was a Satan Disciple. Ebler and Acuna were Latin Kings. These rival gangs did not get along. Earlier that day, defendant's girlfriend told him that she was chased by

some people in a burgundy van. So when a burgundy van arrived in the alley behind his house, in the wee hours of the morning, defendant believed it was the same one.

¶ 8    And this was not the first time that defendant believed he was the victim of an arson. The parties stipulated that about a month earlier, again around 4:30 a.m., he had reported that his car was on fire. (The fire department, however, did not find clear evidence of an arson.) A few days later, around 3:00 a.m., defendant's mother reported a suspected arson of the home after she smelled gasoline, opened the door, and saw a man in a black hoodie flee from their doorway. The police observed char marks on the front door of the house. Ebler was arrested in connection with that incident, but he was never charged.

¶ 9    Against this backdrop, defendant believed that the people in the burgundy van were there to "finish what they started." He had recently purchased a .44 magnum to protect himself from what he perceived to be an ongoing threat from a rival gang. (He installed the security system at the same time.) When he went outside with the gun, he smelled gasoline, although he didn't see anything burning at the time. He did see two men in ski masks running toward him. They were "close," but defendant could not be any more specific about their distance from him or his house at the time. One of them "reached for something shiny," and defendant fired four gunshots. Two struck Ebler in the leg, and one struck Kuelbs, fatally, in the neck. The medical examiner found that Kuelbs's wound coursed from "front to back." (The parties' stipulation erroneously stated the Kuelbs died of multiple gunshot wounds; the medical examiner's report was clear that in fact there was only one. This point was eventually brought to the trial court's attention in the postconviction proceedings.)

¶ 10    As it turned out, the gasoline smell was from defendant's car, which someone had set on fire. The police found paper sticking out of the gas line, a charred gas cap, and a partially melted

rear fender. They also found a red gasoline can in the middle of the street, a lighter, and a black ski mask.

¶ 11    Detective Arambula interviewed Acuna later that day. According to the detective, Acuna said that he heard Ebler and Kuelbs talking about "doing some gang shit" in the van. They told Concetta to drive to Quinn street, where defendant lived, and pointed out defendant's house and car. Ebler then told Concetta to park in the alley. Kuelbs tucked a red gasoline can under his left arm and partially covered it with a black hoodie. Ebler and Kuelbs got out of the van.

¶ 12    At trial, Acuna denied that he made any of the statements the detective attributed to him. According to Acuna, Concetta, and Ebler, nobody had a gasoline can, and nobody was there to set anything on fire. It was pure coincidence that they were in defendant's neighborhood at all. As it happened, they came to the neighborhood to buy cannabis from someone who lived down the street from defendant. (Defendant lived in Bridgeport, on the south side of Chicago; the others lived in Bridgeview, in the south suburbs). And Ebler, who was drunk, wanted to stop at his cousin's house, also down the street, to use the bathroom.

¶ 13    Ebler heard Kuelbs call out defendant's nickname while they were walking. Somebody then said, "kill that bitch," immediately before gunshots were fired. Ebler identified defendant, whom he did not know but had seen "around," as the shooter.

¶ 14    The trial court found that defendant's "belief that he was acting in self-defense was unreasonable," and hence that he was guilty of the second-degree murder of Kuelbs and the aggravated battery of Ebler. The court sentenced defendant to 7 years in prison on each count, with the terms to run consecutively.

¶ 15    At defendant's express instruction, trial counsel filed a notice of appeal. The Office of the State Appellate Defender (OSAD) was appointed and later filed a motion to voluntarily dismiss

defendant's direct appeal, along with a declaration of consent signed by defendant. We granted that motion.

¶ 16 Defendant filed a timely postconviction petition, along with his own affidavits, alleging the claims enumerated above (among others not at issue on appeal). He also submitted affidavits from family members attesting to the alleged prior arsons of the car and house, in support of his claim that trial counsel should have raised a defense of dwelling. And in support of his claim of ineffective assistance of appellate counsel, defendant submitted various letters from direct-appeal counsel, sent to him in connection with the dismissal of his appeal. We will describe the contents of those letters, as well as the finer points of defendant's allegations, as they become relevant to our analysis.

¶ 17 The circuit court advanced the petition and appointed postconviction counsel, who filed a supplemental petition. Counsel revised and elaborated on the defense-of-dwelling issue and submitted revised affidavits from defendant's mother and sister regarding the alleged prior arson incidents. The judge—a different judge than the one who presided over defendant's bench trial— dismissed all of defendant's claims after oral argument at the second stage.

¶ 18                                                     ANALYSIS

¶ 19 At the second stage of postconviction review, the question is whether the allegations of a constitutional violation are legally sufficient in that, if proven, they would entitle the petitioner to relief. *People v. Domagala*, 2013 IL 113688, ¶¶ 34-35. If so, he has made a "substantial showing" of a constitutional violation and is entitled to a third-stage evidentiary hearing. *Id.* Partial dismissals are permitted at the second stage; only those specific claims that are legally sufficient should be advanced to a hearing. *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 55.

¶ 20 The court must take all well-pleaded allegations as true, unless they are positively rebutted by the record, and may not make credibility determinations or otherwise engage in fact-finding. *Domagala*, 2013 IL 113688, ¶ 35; *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Our review of a second-stage dismissal is *de novo*. *Coleman*, 183 Ill. 2d at 388.

¶ 21 To advance to a hearing on any of his ineffective-assistance claims, defendant must plead facts sufficient to show that counsel was deficient and that he was prejudiced by counsel's errors. *Domagala*, 2013 IL 113688, ¶¶ 35-36; see *Strickland v. Washington*, 466 U.S. 668 (1983). The *Strickland* standard applies to claims of ineffective assistance of either trial or direct-appeal counsel. *People v. Harris*, 206 Ill. 2d 1, 34 (2002).

¶ 22                                    I. Dismissal of direct appeal

¶ 23 Defendant claims that direct-appeal counsel was ineffective for advising him to dismiss his appeal on an objectively unreasonable ground. The trial court ordered defendant's sentences to run consecutively, but as defendant alleges, IDOC initially calculated his discharge date as if his sentences were to run *concurrently*. And a letter from direct-appeal counsel, responding to an inquiry by defendant almost two years after the appeal was dismissed, confirms that at some point IDOC corrected that mistake: "the prison revised [defendant's] outdate" to reflect consecutive, not concurrent, sentences. By that time two years later, however, counsel apparently had no recollection of the issue and had to ask defendant, "Do you know why that is?"

¶ 24 In any event, the petition alleges that direct-appeal counsel had advised defendant that, if he pursued an appeal, IDOC would—or at least would be more likely to—discover and correct its record-keeping error, and that he would be wise to dismiss his appeal to avoid the risk of losing his three-and-a-half-year windfall. What's more, counsel allegedly offered this advice without discussing the merits of any potential direct-appeal issues with defendant. Defendant

heeded counsel's advice, only to have IDOC correct its own error, anyway, while transferring him to a different facility. According to the petition, in other words, defendant dropped his appeal ultimately for nothing.

¶ 25    We start with the element of deficient performance. Defendant must show that counsel's performance fell below an objective standard of reasonableness. *People v. Brown*, 2017 IL 121681, ¶ 25. The State argues that direct-appeal counsel's advice was not objectively unreasonable because it was ultimately defendant's decision, not counsel's, to dismiss the appeal. The State is correct that the decision to appeal is one of the few decisions in a criminal case that *only* the defendant can make. *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *People v. Medina*, 221 Ill. 2d 394, 403 (2006). But this point is not responsive to defendant's argument. Defendant does not claim that direct-appeal counsel claimed that decision for his own; rather, the petition alleges that direct-appeal counsel gave him deficient advice on which defendant relied in making the decision to drop his direct appeal.

¶ 26    In deciding whether to pursue an appeal—or in making any other decision that belongs to him personally—a defendant is entitled to and "obviously requires the advice of counsel," to aid him in assessing the risks and benefits of the available alternatives. See *Medina*, 221 Ill. 2d at 406 (decision to request lesser-included instruction). That the decision ultimately belongs to the defendant does not diminish counsel's responsibility to give competent and reasonable advice, consistent with prevailing professional norms. Counsel may, for instance, be deemed ineffective for dispensing unreasonable advice to a defendant who is considering a plea offer, even though the decision ultimately is for the defendant only. *Hill v. Lockhart*, 474 U.S. 52 (1985). The point is no different when, as in this case, the defendant is deciding whether to pursue a direct appeal.

¶ 27     The advice direct-appeal counsel (allegedly) gave here to defendant might be seen in a different light if, for example, the *trial court* had made an error in sentencing—forgetting to impose a gun enhancement, for example, or imposing concurrent rather than consecutive sentences—and the appeal arose, as it did, before our supreme court's decision in *People v. Castleberry*, 2016 IL 116916. Pre-*Castleberry*, the State was entitled to ask the reviewing court, on a defendant's direct appeal, to correct a sentencing error made by the court. See *People v. Arna*, 168 Ill. 2d 107, 113 (1995). If, pre-*Castleberry*, direct-appeal counsel saw such a sentencing error by the trial court, counsel might reasonably strategize that a direct appeal risked drawing the State's attention to the sentencing error, and all things considered (including a consideration of the overall strength of the defendant's potential appeal), the defendant might be better off *not* appealing at all and taking the "windfall" he received from the sentencing error.

¶ 28     But that is not what happened here. There was no sentencing error by the trial court; the error was an administrative mistake by IDOC in its own internal records. There is no particular reason why an appeal raising various points of law would have any effect on IDOC. There would have been nothing in the record on appeal to which the State could point. IDOC's internal records are simply not at issue on direct review of a conviction.

¶ 29     We have not been given any reason, and we can think of none, why a pending appeal would make IDOC more likely to discover its own record-keeping error. Nothing prevents IDOC from spotting and correcting its own errors, as this case demonstrates: IDOC discovered its error in the process of transferring defendant to a new facility.

¶ 30     So if, as the petition alleges, direct-appeal counsel advised defendant to drop his appeal to avoid exposing IDOC's clerical error that resulted in a windfall to defendant, that advice was based not on reasoned strategy but on speculation, and not particularly worthy speculation. And

it was all the more dubious in light of the importance of the right being waived, the right to appeal a conviction. We emphasize that we are taking the allegations in the petition as true; they may not ultimately be. But if they are, then counsel's advice to defendant was objectively unreasonable.

¶ 31    The State offers another reason to affirm the dismissal of defendant's claim: He did not submit documentation showing that his "allegations are capable of objective or independent corroboration" or explain why he was unable to do so. *People v. Hall*, 217 Ill. 2d 324, 332 (2005); see 725 ILCS 5/122-2 (West 2016).

¶ 32    Above all, the State says, defendant should have attached counsel's motion to dismiss the direct appeal and the accompanying declaration of consent signed by defendant. "[I]t stands to reason," in the State's view, that these "especially relevant" documents would state the "reasons * * * for seeking dismissal" of defendant's direct appeal.

¶ 33    We disagree for several reasons. First, we have been cited no authority that requires defendants to explain why they are voluntarily dismissing their appeal. We are aware of case law in a related context, holding that the *waiver* of the right to appeal must be knowing and voluntary. See *People v. McCaslin*, 2014 IL App (2d) 130571, ¶ 23. Perhaps we would subject the voluntary dismissal of a pre-existing appeal to the same standard—a question we need not decide here—but we can think of no reason why we would require defendants to detail their *reasons* for forgoing an appeal, any more than we would require them to explain their tactical reasons for pleading guilty. See *id*. ¶ 20 (analogizing waivers of appeal to guilty pleas governed by Illinois Supreme Court Rule 402 (eff. July 1, 2012)).

¶ 34    Second, if a defendant were considering dismissing an appeal so as not to alert the State to a sentencing error or, as here, an error in IDOC's calculation of that sentence, the last thing a

defendant would do is *highlight* that reason in a motion to dismiss. Indeed, direct-appeal counsel seemingly made that very point to defendant in writing, when counsel sent to defendant the certification he was required to sign in dismissing the appeal: "As we discussed over the phone, it is best that you not inform people of the nature of the issue we spoke about."

¶ 35    And third, failing that other evidence, defendant's only other corroboration could come from his direct-appeal counsel whom he charges with deficient performance. The State concedes that defendant cannot be faulted for failing to obtain *that* affidavit. *Hall*, 217 Ill. 2d at 333 (at second stage, "[f]ailure to attach independent corroborating documentation or explain its absence may, nonetheless, be excused where the petition contains facts sufficient to infer that the only affidavit the defendant could have furnished, other than his own sworn statement, was that of his attorney.").

¶ 36    In these circumstances, the only way to corroborate—or refute—defendant's allegations is to call direct-appeal counsel as a witness at an evidentiary hearing. Thus, we cannot agree that defendant has culpably failed to corroborate his allegations at this earlier stage.

¶ 37    Having sufficiently alleged deficient performance, defendant must also make a substantial showing of prejudice. Typically—when a claim of ineffective assistance of counsel involves an allegation of attorney error "during the course of a legal proceeding," such as a failure to raise an argument, issue, or objection—the defendant must demonstrate a reasonable probability that the "result of the proceeding would have been different," if not for counsel's error. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (quoting *Strickland*, 466 U.S. at 694).

¶ 38    But in some cases, counsel's error results in "the forfeiture of a proceeding itself," rather than a "proceeding of disputed reliability." *Id.* at 483. A different standard of prejudice applies in

these cases: The defendant must show a reasonable probability that he would have availed himself of the proceeding that he forfeited or waived as a result of counsel's error.

¶ 39    For example, a defendant alleging ineffective assistance based on counsel's "deficient advice regarding the consequences of entering a guilty plea" must show a reasonable probability that "he would not have pleaded guilty and would have insisted on going to trial," if not for the deficient advice he received. *Hill*, 474 U.S. at 59; see also *Lee v. United States*, 582 U.S. ___, 137 S. Ct. 1958, 1965 (2017).

¶ 40    And a defendant alleging ineffective assistance based on counsel's failure to file a notice of appeal, without consulting him about this decision, must show a reasonable probability that he "would have timely appealed," if not for counsel's deficient failure to ask him how he wished to proceed. *Flores-Ortega*, 528 U.S. at 484. He is *not* required to show a reasonable probability that he would have *prevailed* on any issue in the appeal—the standard erroneously applied by the circuit court in the proceedings below—or to "specify the points he would raise were his right to appeal reinstated." *Id.* at 486 ("it is unfair to *require* an indigent, perhaps *pro se,* defendant to demonstrate that his hypothetical appeal might have had merit before any advocate has ever reviewed the record in his case in search of potentially meritorious grounds for appeal. Rather, we require the defendant to demonstrate that, but for counsel's deficient conduct, he would have appealed.") (emphasis in original).

¶ 41    The parties agree that this prejudice standard also applies here. And so do we. But the showing it requires, in the context of this case, needs to be stated with more precision than the parties achieve. This case is like *Flores-Ortega* to the extent that counsel's alleged deficiency deprived defendant of a direct appeal. But here, unlike in *Flores-Ortega* (*id.* at 477), no guesswork is required: a notice of appeal *was* filed, at defendant's express request, and was later

dismissed, allegedly in reliance on the advice given by direct-appeal counsel. Applied to this set of facts, a reasonable probability that defendant "would have * * * appealed" (see *id.* at 484) really means a reasonable probability that he would have proceeded with an appeal he had already filed, if not for direct-appeal counsel's allegedly deficient advice to dismiss it.

¶ 42    Spelling out the required showing in this way underscores the key point: Defendant chose to appeal his conviction, at least at the outset. And we know this to a certainty. After the motion to reconsider sentence was denied, trial counsel told the judge, "I've spoken to my client and he does indicate that he wishes to file a notice of a [*sic*] appeal with regards to this matter * * * and is asking that the State Appellate Defender be appointed." The judge asked defendant to confirm this, and he answered, "Yes, sir."

¶ 43    Because defendant undeniably asserted his right to an appeal, the real question is what led him to change his mind later. Though we have yet to hear from direct-appeal counsel in these postconviction proceedings, counsel's written admonition to defendant when discussing the voluntary dismissal of his appeal—that "it would be best that you not inform people of the nature of the issue we spoke about"—at least makes clear that whatever the reason was, defendant should be wary of telling anyone else about it.

¶ 44    Considering defendant's initial decision to appeal and counsel's advice to keep the reason for the dismissal under wraps, there is a reasonable probability that the allegedly deficient advice regarding IDOC's internal error led defendant to dismiss his appeal. In fact, at this stage, at least, there is no other apparent or plausible explanation for the dismissal.

¶ 45    In light of that conclusion, we need not consider the parties' prejudice arguments in any detail. The State is wrong to assert that there is nothing beyond defendant's own "self-serving statement" to suggest that he wanted to appeal his conviction. And we have already disposed of

the State's argument that it was ultimately defendant's decision, not counsel's, to dismiss the appeal. That does not show a lack of prejudice any more than it shows a lack of deficiency. For his own part, defendant sets out to identify potential appellate issues. Fair enough. See *id.* at 486 (identifying non-frivolous issues, while not required, is one way to "give weight" to claim that defendant would have appealed). But these points are unnecessary, in light of the direct and irrebuttable evidence that he intended to appeal his conviction, as shown by his notice of appeal—at least until direct-appeal counsel (allegedly) advised him not to.

¶ 46     Taken as true, defendant's allegations establish that he dismissed his direct appeal in reliance on deficient advice from counsel. As this claim in the petition alleged both deficiency and prejudice, this claim is remanded for a third-stage evidentiary hearing.

¶ 47                                    II. Defense of dwelling

¶ 48     Defendant argued at trial that he was justified in shooting Kuelbs and Ebler because he reasonably believed that they were coming to set his house on fire and thus posed an imminent threat to life and limb—both his own and that of his family. On this basis, trial counsel asserted affirmative defenses of self-defense and defense of others. Defendant contends that counsel was ineffective for not asserting a third affirmative defense—namely, the defense of dwelling.

¶ 49     The affirmative defenses of self-defense and defense of others provide that a person is justified in the use of deadly force only if he reasonably believes that deadly force is necessary "to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016).

¶ 50     The affirmative defense of dwelling provides that a person is justified in the use of deadly force only if: (1) someone unlawfully enters or attempts to enter his dwelling "in a violent, riotous, or tumultuous manner," and he reasonably believes that deadly force is necessary "to

prevent an assault upon, or offer of personal violence to, him or another then in the dwelling," *or* (2) he reasonably believes that deadly force is necessary "to prevent the commission of a felony in the dwelling." *Id.* § 7-2(a)(1)-(2).

¶ 51    The defense of dwelling overlaps significantly with self-defense and defense of others. The key difference, for our purposes, is this: Outside of the home, a defendant may not resort to deadly force unless he reasonably perceives a threat of imminent death, great bodily harm, or a forcible felony. *Id*. § 7-1(a). But inside the home, he may resort to deadly force if he reasonably perceives a threat of an assault, some other act of violence, or a felony of any kind. *Id*. § 7-2(a)(2). In other words, there is a lower threshold for the justifiable use of deadly force when an assailant has entered or is attempting to enter the home.

¶ 52    That distinction does not help defendant here. His argument on appeal is that the trial court may well have acquitted him if counsel had argued that he was "justified in using force to defend his dwelling," and more specifically, "to prevent the commission of another arson to his home."

¶ 53    But even if counsel never explicitly invoked the defense of dwelling, counsel did argue, in no uncertain terms, that defendant was justified in shooting Kuelbs and Ebler because he reasonably believed that they were coming to burn down his house. Indeed, that was the whole theory of defense.

¶ 54    As counsel first explained in the defense's opening statement, Kuelbs, Ebler, and the others in the van "came to [defendant's] property to do violence," as "they had done on prior occasions." Thus, defendant acted "in self-defense and in the defense of others from causing greater harm from people *trying to burn up that property* to do violence to them." (Emphasis added.) Counsel pursued this theory, however successfully, on cross-examination of the State's

witnesses, entered into several stipulations meant to prove up the prior acts of arson on which the theory was predicated, made it the focus of defendant's testimony, and returned to it during the defense's closing argument. In short, defendant's underlying contention—that he reasonably believed Kuelbs and Ebler were about to set his house on fire—was squarely before the court.

¶ 55    If the trial court accepted that contention, it should have acquitted defendant on grounds of self-defense and/or defense of others, the affirmative defenses that counsel raised at trial. As we noted above, even outside of the home, a defendant is justified in using deadly force if he reasonably believes it is "necessary to prevent *** the commission of a forcible felony." *Id.* § 7-1(a). Arson is a forcible felony. *Id.* § 2-8. And of course, setting defendant's house on fire would pose an imminent risk of death or great bodily harm to defendant and his family.

¶ 56    The problem for defendant, in other words, is not that trial counsel failed to invoke the lowered threshold for the justifiable use of deadly force to defend a dwelling. Rather, the problem for defendant is that while he *believed* shooting Kuelbs and Ebler was necessary to prevent them from setting his house on fire, the trial court found this belief to be *unreasonable*, albeit sincere. (The judge did not say why it was unreasonable.) That is why the trial court convicted him of second-degree murder. See *id.* § 9-2(a)(2).

¶ 57    Given that factual finding, asserting a defense of dwelling would not and should not have changed the outcome of the trial. Thus, defendant's allegations do not establish prejudice, and we can dispose of his ineffective-assistance claim on this basis alone. *People v. Saleh*, 2020 IL App (1st) 172979, ¶ 50.

¶ 58                                III. Jury waiver

¶ 59    Defendant's petition recounts the conversation with counsel that led him to elect a bench trial. Sometime before he signed the jury waiver, he told counsel that he wanted a jury trial. But

"counsel responded that this was a bench trial." Defendant asked what he "mean[t] by that," and counsel said, "there's no way I'm trying this case before a jury." Counsel allegedly "went on" to explain that "he's been before this judge and that he's a good judge and a law judge and he knows that he could win with this judge." For this reason, counsel "advised" defendant "to tell the judge he wanted a bench trial" and "insisted on a bench trial telling [defendant] that jurors are not reliable because they don't know or understand the law." So when the time came, defendant signed the waiver and told the judge, after receiving admonishments in open court, that he wanted a bench trial—even though he allegedly didn't.

¶ 60    Based on these factual allegations, defendant claimed in his petition that trial counsel was ineffective on two different grounds, although the petition (even after review by postconviction counsel) did not distinguish them. First, the advice to take a bench trial "cannot be considered strategic," or even "the advice of one advocating on behalf of the petitioner," because it was based on trial counsel's "alleged personal history with a judge."

¶ 61    Appellate counsel has not pursued this theory of ineffective assistance, and rightfully so. Counsel's advice to choose a bench trial (or, for that matter, a jury trial) *is* a matter of strategy, at least when, as in this case, it is based on counsel's knowledge of the judge from prior trials and thus counsel's assessment of how the judge will likely view the key issues in the case. *People v. Hobson*, 386 Ill. App. 3d 221, 243 (2008) (affirming second-stage dismissal of *Strickland* claim where counsel advised taking bench trial because he "knew the judge" and believed judge was likely to credit theory of self-defense); see also *People v. Simon*, 2014 IL App (1st) 130567, ¶ 74 (advice on waiving jury trial, because judge would be better fit for defense's legal theory, constitutes trial strategy and not ineffectiveness).

¶ 62    On appeal, defendant *does* press his second theory, namely that defendant did not "understand * * * that the right to a trial by jury was his choice and not counsel's." To the contrary, he "believed the choice of trial was in fact counsel's choice and not [his]." Of course, defendant's alleged impression was wrong; the choice between a jury trial and a bench trial was his alone to make. *People v. Phillips*, 217 Ill. 2d 270, 281 (2005). And so, he says, counsel's advice was deficient. It did not impart a full understanding of his right to a jury trial and thus caused him to waive that right even though he did not want to.

¶ 63    As appellate counsel frames the issue, defendant's jury waiver was not knowing and voluntary, because it was induced by "improper representations" and a "failure to advise" him regarding his right to a jury trial. In this way, trial counsel "deprived" him of this right and was therefore ineffective.

¶ 64    To be clear, defendant does not claim that he didn't understand the differences between a jury and a bench trial. So he does not contend that the jury waiver allegedly induced by counsel was invalid in the usual sense. And he was well aware that there was a choice to be made, by the defense, between these options. Rather, his claim is a narrow one: He did not understand that he alone, and not his attorney, had the ultimate authority to make this choice.

¶ 65    Conspicuously absent from the petition's factual allegations is any contention that trial counsel affirmatively misrepresented the law. This case is not like *People v. Barkes*, 399 Ill. App. 3d 980, 988 (2010), where counsel allegedly said that he "was running the show," and hence that the defendant "was getting a jury trial," even though he wanted a bench trial. Here, there is no allegation that counsel expressly claimed the authority to overrule defendant and choose a bench trial on his behalf.

¶ 66     The absence of that allegation is significant at the second stage. Not so much at the first stage, perhaps, when the *pro se* petitioner may not know how to put his best foot forward. But defendant's claim has been reviewed by an attorney, who revised and supplemented the petition and supporting evidence. At this stage, if an affirmative or outright misrepresentation by trial counsel could truthfully be alleged, we would expect to see that allegation, as it would bolster defendant's claim, and significantly so.

¶ 67     But the petition does not allege that counsel claimed the decision as his own. Instead, it merely alleges that defendant *understood* counsel's words to mean that counsel controlled the decision. The question of deficiency, however, is an objective one. *Brown*, 2017 IL 121681, ¶ 25. So what matters here is not what defendant subjectively understood but what would have been reasonable for him to understand from counsel's words.

¶ 68     In other words, because counsel did not affirmatively misstate the law, the question is whether he nonetheless *misled* defendant, in this objective sense: Relying on his conversation with counsel, did defendant reasonably conclude that the law gives counsel the ultimate authority to choose between a jury and a bench trial?

¶ 69     To be sure, some of counsel's statements to defendant during that conversation might sound like counsel putting his foot down, at least when they are taken at face value and out of their broader context. Most notable, in this regard, are these two statements: "This was a bench trial," and "there's no way I'm trying this case before a jury."

¶ 70     Recall how the conversation went: Defendant said he wanted a jury; counsel responded, "[t]his was a bench trial;" defendant asked what he "mean[t] by that." Counsel first came back with, "there's no way I'm trying this case before a jury," and then "went on" to explain that the known entity on the bench, "a good judge and a law judge," was a better bet than an "unreliable"

jury, which may not understand or faithfully apply the legal principles (of justified use of force) at issue in this case.

¶ 71   When counsel's statements are considered in their broader context of the conversation as a whole, rather than in isolation, it becomes clear that counsel was offering his strategic advice. Counsel's point, and the overall gist of the conversation—expressed in admittedly emphatic language—was that *this was a case for* a bench trial. In counsel's considered and experienced-based judgment, having a jury as the factfinder would be a mistake. Counsel thus "advised" him, in defendant's own words, to tell the judge that he wanted a bench trial. Considering the conversation as a whole, we are not convinced that counsel in any way implied that he had the ultimate legal authority to decide what kind of trial defendant would have, or that defendant had no right to make this decision for himself.

¶ 72   Nor would the jury-waiver procedure that later took place have left defendant with that impression. Quite to the contrary, that process, *itself*, should have been enough to demonstrate to defendant that the decision to waive a jury trial was his and his alone. Throughout the pretrial proceedings, it is counsel who files and signs all manner of pleadings on the defense's behalf and who speaks on behalf of the defendant, who remains largely mute. Yet the jury waiver must be signed by the defendant *personally*. And the judge asks the defendant *personally* whether he wants a jury or a bench trial.

¶ 73   Here, the admonishments regarding the jury trial waiver were as follows:

> [THE COURT]: Mr. Rodriguez, your matter is here for trial today. *You're entitled to a trial, whether it be a jury trial or a bench trial*. You're charged by way of indictment of the offense of first degree murder, attempt first degree murder, and aggravated battery with a firearm. This indictment has a total of 19 counts to it. *As I said, you're entitled to a trial whether it be a jury trial or a bench trial*. Do you know what a jury trial is?
>
> [PETITIONER]: Yes, sir.

[THE COURT]: How old are you?

[PETITIONER]: 28.

[THE COURT]: How far did you go in school?

[PETITIONER]: To the senior year in high school.

[THE COURT]: Did you sign that?

[PETITIONER]: Yes, sir.

[THE COURT]: *By signing this piece of paper and giving it to me you're telling me you want to give up your right to a jury trial and let me hear the facts of the case* and determine whether the State can prove you guilty beyond a reasonable doubt of these charges; *is that what you want*?

[PETITIONER]: Yes, sir.

[THE COURT]: Do you know what a jury trial is?

[PETITIONER]: Yes, sir.

[THE COURT]: I accept your waiver of jury today. (Emphases added.)

¶ 74    Though the trial court did not specifically mention that the choice to waive a jury trial belonged to the defendant and the defendant alone, it should have been obvious by the fact that the court was directing the questions to defendant. The entire waiver process was necessarily— and conspicuously—directed toward defendant personally. It is difficult to imagine how a defendant who has been left to draw his own inferences about his jury-trial right could go through this process and reasonably claim that he was led astray, into a false belief that his attorney could force him to take a bench trial when he wanted a jury. So even if we were to agree that counsel's failure to instill clarity about this matter was a sufficient basis for a finding of deficiency (and we do not go that far), we still would not find that defendant suffered prejudice.

See *People v. Todd*, 178 Ill. 2d 297, 318 (1997) (defendant must establish reasonable probability that he would have demanded jury trial if not for defect in counsel's advice).

¶ 75     We would make one final distinction between this case and *Barkes*, 399 Ill. App. 3d at 982, where we found that the defendant stated the gist of an ineffectiveness claim when the assistant public defender told defendant that he "was running the show" and defendant "was getting a jury trial." Here, defendant's lawyer was privately retained counsel. So even if we interpreted counsel's comments here as implying that the choice of a bench trial was counsel's, not defendant's, and that counsel was insisting on a bench trial, defendant would not have been forced to accept that decision—because defendant could have terminated counsel's representation and hired another lawyer who agreed with his preferred strategy.

¶ 76     A defendant who, as here, can afford his own lawyer is generally entitled to his counsel of choice. See *Wheat v. United States*, 486 U.S. 153, 159 (1988); *People v. Baez*, 241 Ill. 2d 44, 105 (2011). And likewise, counsel who, for whatever reason, chooses not to represent a client (based on inability to pay, trial strategy, or any other reason) is free not to represent that client. *Wheat*, 486 U.S. at 159; *Baez*, 241 Ill. 2d at 105. Simply put, defendant was not stuck with a defense strategy he did not like, because he was not required to keep a lawyer with whom he disagreed on strategy.

¶ 77     That stands in contrast to a defendant like the one in *Barkes* with appointed counsel. A defendant has far less flexibility in terminating appointed counsel with whom he disagrees. See *Baez*, 241 Ill. 2d at 106 n.5 ("the right to counsel of choice does not extend to defendants who require counsel to be appointed for them."); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (same); see also *Barkes*, 399 Ill. App. 3d at 983 (assistant public defender allegedly told defendant that he "could not fire" him "as trial counsel"). That is to say, a "criminal defendant

has no right to choose his appointed counsel or insist on representation by a particular public defender," and "dissatisfaction with one's counsel, a deteriorated relationship, or the fact that defense counsel and defendant argue or disagree about trial tactics, alone, will not constitute good cause for substitution." *People v. Wanke*, 303 Ill. App. 3d 772, 782 (1999); see also *People v. DeRossett,* 262 Ill. App. 3d 541, 543–44 (1994); *People v. Royark,* 215 Ill. App. 3d 255, 266–67 (1991).

¶ 78 So while the defendant in *Barkes* might have felt confined to representation by his appointed counsel with whom he disagreed, we cannot say the same of defendant here. Even if his lawyer (allegedly) outright refused to participate in a trial by jury, and even if counsel (allegedly) misled defendant into believing that defendant had no say in the matter, defendant was *still* not required to live with that strategic choice, because he was free to terminate that attorney and find one more in line with his strategic preferences.

¶ 79 For all the reasons we have given, having alleged neither deficiency nor prejudice, this portion of the petition was properly dismissed.

¶ 80                                     CONCLUSION

¶ 81 For these reasons, we reverse the dismissal of defendant's postconviction claim of ineffective assistance of appellate counsel and remand that claim for a third-stage hearing. We affirm the dismissal of his claims of ineffective assistance of trial counsel.

¶ 82 Affirmed in part, reversed and remanded in part.