2024 IL App (1st) 221038-U

SECOND DIVISION
June 25, 2024

No. 1-22-1038

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 02061 |
| | ) | |
| JOSE RODRIGUEZ, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Reversed and remanded for new trial. Trial counsel was ineffective for failing to offer victim's prior arson conviction as *Lynch* evidence, where defendant claimed to shoot in self-defense to prevent victims from setting fire to his house. Evidence was sufficient to find defendant guilty of second-degree murder and aggravated battery with a firearm.

¶ 2   Defendant Jose Rodriguez shot Gino Kuelbs and John Ebler as they were running down the sidewalk toward his house. He was charged with the first-degree murder of Kuelbs and the attempted murder of Ebler. Claiming self-defense (and defense of others), defendant testified that he shot Ebler and Kuelbs to prevent them from setting fire to his house. After a bench trial, he was found guilty of second-degree murder, based on "imperfect" or "unreasonable" self-defense, and aggravated battery with a firearm.

¶ 3     Defendant argues on appeal that no rational trier of fact could have convicted him of even these lesser offenses. In his view, the evidence that he acted reasonably, in justified self-defense, was simply incontrovertible. We cannot go that far. But we do agree that this was a very close case; the evidence of self-defense was significant, even if it falls short of the mark for an outright reversal under the demanding *Jackson* standard. Which leads us to conclude that one missing piece of evidence could have made the difference for the defense.

¶ 4     Ebler, it turns out, was a convicted arsonist. But defense counsel failed to offer his arson conviction as *Lynch* evidence to support defendant's self-defense claim. Ebler's demonstrated propensity to commit arson made it more likely that defendant correctly, and thus reasonably, perceived an arson to be imminent here. We hold that counsel was ineffective for failing to offer this *Lynch* evidence. We reverse defendant's convictions and remand for a new trial.

¶ 5                                    BACKGROUND

¶ 6     As both appellate issues turn on the question of self-defense, we will recap the pertinent trial evidence with an eye toward this question. But first, a brief procedural history of this appeal.

¶ 7     After his trial, defendant voluntarily dismissed his direct appeal. He then filed a post-conviction petition alleging, among other things, that he did so in reliance on the unreasonable advice that he received from his appointed appellate counsel. In a previous order, we remanded for an evidentiary hearing on that claim. *People v. Rodriguez*, 2021 IL App (1st) 181729-U. On remand, the circuit court granted relief in the form of leave to file a notice of appeal. The State has not contested that relief. So for all practical purposes, this second appeal is defendant's direct appeal, although the usual order of proceedings has been reversed. He is thus free to raise any issues, without procedural default, that ordinarily may be raised on direct appeal.

¶ 8     At 4:30 a.m., on the night of the shooting, Ebler and Kuelbs arrived on defendant's block

in a burgundy van. Ebler's sister Concetta, and a friend, Ascencion Acuna, were in the van with them. Concetta was driving. Defendant saw the van driving through the alley on the video feed from his home security system. In short order, he grabbed his gun, went outside, and opened fire, killing Kuelbs and striking Ebler as they were running toward him, in front of his house.

¶ 9      Defendant admitted from the start that he shot them, cooperated fully with the police investigation, and promptly turned over his gun and the security footage when the police arrived on the scene. In fact, it was defendant who called the police in the first place, immediately after the shooting. Facts like these (among others) surely explain why the trial court credited him with a sincere belief that he acted in self-defense. Specifically, as we have already noted, defendant believed that Ebler and Kuelbs were coming to set fire to his house. Many of defendant's family members, including his aging parents and his young children and nephews, were inside the house sleeping. Believing they "would all be dead" if he left Ebler and Kuelbs to their own devices, defendant opened fire in self-defense, and in defense of his family.

¶ 10     The evidence strongly suggested that defendant and the victims were mired in an ongoing gang conflict. Defendant was a Satan Disciple. Ebler and Acuna (if not others, too) were Latin Kings. These rival gangs did not get along. Earlier that day, defendant's girlfriend told him that she was chased and threatened by some people in a burgundy van. So when a burgundy van arrived in the alley behind his house, in the wee hours of the morning, defendant believed it was the same one.

¶ 11     Nor was this the first time that defendant believed he was the victim of an arson. The parties stipulated that about a month earlier, again around 4:30 a.m., defendant reported that his car was on fire. There is no dispute that his car, as depicted in a defense photo exhibit, was badly scorched and extensively damaged, but upon investigation, the fire department concluded that no

clear evidence of arson was left behind at the scene. (Unlike the night of the shooting at issue here. More on this point shortly.)

¶ 12    A few days later, around 3:00 a.m., defendant's mother reported a suspected arson of the home after she smelled gasoline, opened the front door, and saw a man in a black hoodie flee from their doorway. The police observed char marks on the front door of the house. Ebler was arrested in connection with that incident, but he was never charged.

¶ 13    Against this backdrop, defendant believed that the people in the burgundy van were there to "finish what they started." He had recently purchased a gun to protect himself from what he perceived to be an ongoing threat from a rival gang. His parents, who owned the property, had installed the security system around the same time and for the same reason.

¶ 14    When defendant went outside, he smelled gasoline and a "burning smell," although he didn't see what was burning at the time. He did see two men in ski masks running toward him. They were "close," but defendant could not be any more specific in his testimony about their distance from him or his house at the time. One of them "reached for something shiny," and defendant fired four gunshots. Two struck Ebler in the leg, and one struck Kuelbs, fatally, in the neck. Kuelbs managed to run back to the van, which was still parked somewhere in the alley. Ebler crawled under a different van that was parked across the street from defendant's house.

¶ 15    As it turned out, the gasoline smell was from defendant's car, which had been set on fire. (Not the same car that was burned in the previous arson; from the looks of the photo exhibit, that car was already out of commission. This car was registered to defendant's mother, but it was referred to at trial as defendant's car, so we will follow that practice.)

¶ 16    Sergeant Ramaglia observed the car and found it evident that "someone tried to torch the vehicle." This time, the evidence of arson was undeniable, indeed. Along with a partially melted

rear fender and a charred gas cap, the police found kindling sticking out of the gas line. The sergeant also testified that Ebler was a suspect in the arson investigation pertaining to the car, though there was no evidence presented at trial that Ebler was ever charged.

¶ 17    The police found a lighter and a black ski mask in the street. There was a red gasoline can within feet of the van that Ebler crawled under (and where the police found him). Defendant told Sergeant Ramaglia that Ebler was the one responsible for burning his car and trying to burn his house in the preceding weeks. Defendant later told the police that the burgundy van he saw on the surveillance tape was the same van driven by whoever threatened and chased his girlfriend earlier that day, or so he believed.

¶ 18    Detective Arambula interviewed Acuna later that day. According to the detective, Acuna said that he heard Ebler and Kuelbs talking about "doing some gang shit" in the van. They told Concetta to drive to Quinn Street, where defendant lived, and pointed out defendant's house and car. Ebler then told Concetta to park in the alley. Kuelbs tucked a red gasoline can under his left arm and partially covered it with a black hoodie. Ebler had a lighter. Ebler and Kuelbs got out of the van and told Concetta, who was driving, not to leave. Acuna stayed behind.

¶ 19    At trial, Acuna denied that he made any of the statements the detective attributed to him. According to Acuna, Concetta, and Ebler, nobody had a gasoline can, and nobody was there to set anything on fire. It was pure coincidence that they were in defendant's neighborhood at all.

¶ 20    Ebler testified that they spent the night drinking in the van, with Concetta driving them around aimlessly. When it was about time to head home, Kuelbs "wanted to grab a bag of weed," and Ebler needed "to take a pee." So they decided to drop in on Ebler's cousin, who could help out on both fronts, and who supposedly lived down the street from defendant, though none of the witnesses knew his address. (We note that defendant lived in Bridgeport, on the south side of

Chicago; the others lived in Bridgeview, in the south suburbs).

¶ 21    Ebler testified that he heard Kuelbs call out defendant's nickname as they were walking down the street to his cousin's house. Somebody then said, "kill that bitch," immediately before the gunshots were fired. (The surveillance video shows that defendant was alone in front of his house.) Ebler identified defendant, whom he did not know but had seen "around," as the shooter. Ebler denied that he knew where defendant lived.

¶ 22    Video footage from defendant's security system, which had cameras in the front and back of the house, showed the following. The burgundy van passed through an alley behind the house. Less than a minute later, two people—there is no dispute that they are Ebler and Kuelbs—walk up the sidewalk in front of defendant's house. At this point, they are walking toward defendant's car, which is parked on the same side of the street as his house, about three houses up the block.

¶ 23    As they pass by, defendant's house is on their right-hand side. There is a security gate at the front of the property. Within a minute of their passing by, defendant comes out of the house, alone, walks up to the gate, and looks over it. In the following seconds, he passes through the gate and onto the sidewalk, draws his gun, and begins shooting, ducking back behind the gate in the process.

¶ 24    Right as the shooting begins, Ebler suddenly becomes visible. He is running back down the sidewalk, in the direction from which he originally came, so that defendant's house is now on his left-hand side. He is right around the edge of the security gate, and thus defendant's property, when he is shot. He stumbles into the street, eventually making his way to a van parked across from defendant's house.

¶ 25    When the shooting is over, defendant closes the gate and goes inside. The police and paramedics arrive a few minutes later. They quickly discover Ebler under the van. Ebler's path to

the van, after stumbling into the street, takes him directly through the spot where the gas can is found and photographed. But the gas can is never clearly visible on the video, which is limited in perspective, dark, shadowy, and further obscured by the rain that was falling.

¶ 26    (In his brief, defendant claims that Kuelbs is also visible on the video, coming into frame in rapid succession with Ebler. We are not so sure about this; the images we see all appear to be of Ebler, but the limitations of the video make it hard to say. In any event, nothing turns on this point, so we will not belabor it. For what it's worth, Ebler testified that Kuelbs was a bit behind him, so he may have been just outside the camera's range when he was shot.)

¶ 27    Without any further explanation, the trial court found that defendant's "belief that he was acting in self-defense was unreasonable," and thus he was guilty of second-degree murder and aggravated battery with a firearm, but not guilty of first-degree murder or attempted murder. The trial court sentenced defendant to two consecutive 7-year prison sentences. Because of the problem with his original appeal being dismissed and his resort to lengthy postconviction proceedings to simply file a direct appeal, defendant has already served those sentences and his term of mandatory supervised release.

¶ 28                                  ANALYSIS

¶ 29    We have found it more economical, in this particular case, to take the appellate issues out of their usual order and begin not with defendant's sufficiency challenge, but with the issue on which we grant relief. Which is this: trial counsel was ineffective for failing to offer Ebler's arson conviction as so-called *Lynch* evidence, to support defendant's theory of self-defense. See *People v. Lynch*, 104 Ill. 2d 194 (1984). We review this claim under the familiar deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668 (1984), which should require no further introduction. So we will cut to the chase.

¶ 30    Trial counsel was deficient. There is no dispute that Ebler was a convicted arsonist, or that trial counsel knew this to be true. Ebler's arson conviction was admissible at the time of trial under *Lynch*, 104 Ill. 2d 194 (1984), which has since been codified in Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011). It was highly, if not uniquely, probative on the disputed question of whether Ebler (acting together with Kuelbs) or defendant was the aggressor. And the defense had absolutely nothing to lose by offering it as *Lynch* evidence.

¶ 31    Defendant was tried in April 2010, before the Illinois Rules of Evidence were enacted. At the time, competent counsel would have moved to admit Ebler's arson conviction under *Lynch*. This well-known case recognized two bases on which evidence of the "victim's aggressive and violent character" may be admissible "to support a theory of self-defense." *Lynch*, 104 Ill. 2d at 199-200. Only one of the *Lynch* bases is at issue, so we will leave the other one aside.

¶ 32    As relevant here, "evidence of the victim's propensity for violence" may be offered "to support the defendant's version of the facts where there are conflicting accounts of what happened," or in other words, "to show who was the aggressor," when this fact is in dispute. *Id.* at 200; see also Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011) ("In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct.").

¶ 33    This *Lynch* basis is an exception to the general rule against propensity evidence—the fact that the victim was violent on another occasion makes it more likely that the victim was the aggressor on the occasion in question. See *Lynch*, 104 Ill. 2d at 200-01; *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 57. And because the victim's prior act(s) of violence objectively support this conclusion, by means of an authorized propensity inference, they are admissible for this

purpose whether the defendant knew of them or not. *Lynch*, 104 Ill. 2d at 200. Here, defendant did not.

¶ 34 Ebler's arson conviction was admissible under *Lynch*. The State concedes that "Ebler's version of the shooting conflicted with defendant's." It surely did. On defendant's version, Ebler and Kuelbs, gasoline can in hand, had just set fire to his car and were now coming to set fire to his house wearing ski masks. On Ebler's version, there was no arson afoot. There was no arson of the car, at least not by them. The gasoline can found in the street was not theirs. They were innocently heading to Ebler's cousin's house, to buy weed and use the bathroom at 4:30 in the morning, when defendant came outside and shot them for whatever reason. As the State filled in that blank in closing argument, defendant was seeking "retaliation" for the alleged threat to his girlfriend earlier that day.

¶ 35 The fact that is ultimately in dispute here is whether defendant or Ebler was the aggressor in the shooting. The State, of course, pinned the initial act of aggression on defendant: he shot Ebler and Kuelbs to exact vengeance, not to prevent a would-be arson of his house. Defendant pinned it on Ebler: he was on the brink of setting fire to defendant's house. (More precisely, it was Ebler acting together with Kuelbs, though we will simply say "Ebler" from now on, since he is the relevant actor for our purposes here.)

¶ 36 Arson is a forcible felony, and a defendant is justified in using deadly force if he reasonably believes it is "necessary to prevent *** the commission of a forcible felony." 720 ILCS 5/2-8, 7-1(a) (West 2022). Thus, if Ebler was attempting to set fire to defendant's house, he "initially provoke[d] the use of force against himself," and in this way became the aggressor. Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000).

¶ 37 Granted, in the typical scenario, the question of who was the aggressor takes the form of

who threw the first punch, or who reached first for a gun, or something to that effect. The facts of this case are superficially different, a variation on the usual theme, but the disputed question remains the same: was Ebler or defendant the first to resort to unlawful force against the other? Ebler's arson conviction made it objectively more likely that he *was* attempting an arson of defendant's house. Thus, the conviction was relevant and admissible "to support the defendant's version of the facts." *Lynch*, 104 Ill. 2d at 200. Counsel should have offered it for this purpose.

¶ 38    The State argues that Ebler's arson conviction, which dated from 1997, was "too remote in time to be relevant" to the alleged arson(s) against defendant in 2008; thus, counsel was not deficient for failing to offer it as *Lynch* evidence. True, remoteness in time is a relevant factor when considering the admissibility of *Lynch* evidence. *People v. Barnes*, 2017 IL App (1st)143902, ¶¶ 50-51. But unlike impeachment evidence, *Lynch* evidence is not subject to a bright-line 10-year time limit. See *People v. Gibbs*, 2016 IL App (1st) 140785, ¶ 34; *People v. Montgomery*, 47 Ill. 2d 510, 516, 519 (1971); see also Ill. R. Evid. 609(b) (eff. Jan 1, 2011).

¶ 39    And strictly speaking, remoteness in time does not generally render a conviction *per se* irrelevant, as the State says; the point is that the relevance of the conviction may attenuate or diminish over time, and may thus become more and more likely to be outweighed by the risk of unfair prejudice to the State. As we would now say, with the Rules of Evidence in effect, an older conviction is more likely to fail Rule 403 balancing. See Ill. R. Evid. 403 (eff. Jan 1, 2011).

¶ 40    But age alone is generally not dispositive. When offered as *Lynch* evidence, the probative value of a prior conviction depends on the nature of that conviction, the nature of the aggression alleged in the case at hand, and the similarity between the two incidents. So, age aside, the *least* probative type of *Lynch* evidence would be a conviction for a commonplace, generic act of violence that is quite dissimilar from the aggression alleged in the case at hand.

¶ 41    The State's only cited authority on this topic, *Barnes*, 2017 IL App (1st) 143902, is a good example of dissimilar evidence. The defendant in *Barnes* claimed that the victim initiated their violent encounter by trying to rape him and offered the victim's convictions for battery and resisting arrest as *Lynch* evidence. *Id.* ¶¶ 28-30, 44-46. Those convictions had little probative value. They were 21 years old, but remoteness in time was only one problem. *Id.* ¶¶ 44, 48-51. More significantly, they were entirely dissimilar from the alleged aggression; in the prior incident, the victim apparently slammed a door on a police officer's hand as the officer tried to enter his apartment. *Id.* ¶ 45. That conduct may demonstrate a general penchant for "insolent[ ]" behavior, but its relevance to an attempted-rape allegation is minimal. *Id.* ¶ 52. Even more so 21 years later.

¶ 42    This case falls on the far opposite side of the spectrum. Battery is a generically violent act and a commonplace crime. Arson is a far more distinctive type of violent conduct. And here, it was *exactly* the type of violent conduct that Ebler was committing again, at least on defendant's version of the disputed facts. This is the *most* probative type of *Lynch* evidence that a defendant can offer: a conviction for a distinctive, relatively uncommon type of violent act that is identical to the conduct that (allegedly) initiated the violent encounter now at issue. The *Lynch* propensity inference is obviously at its strongest in these circumstances.

¶ 43    For the same reasons, the relevance of such a conviction is also the most durable; it will not diminish over time, at least not to the same degree as a conviction for a generic and/or dissimilar act of violence. If Ebler had an 11-year old battery conviction, for instance, it might have fairly scant probative value in this case. But an arson conviction remained highly relevant, even with the passage of time, given the defense theory that Ebler was trying to set fire to defendant's house.

¶ 44 Lastly, on the issue of counsel's deficient performance, it bears emphasis that there was no strategic reason for the defense to forego this *Lynch* evidence. Defendant claimed that he was acting to prevent an imminent arson of his house. Ebler denied that he was up to any such thing. The defense had absolutely nothing to lose by offering Ebler's arson conviction as support for defendant's version of these disputed facts. Counsel was deficient for not offering that conviction as *Lynch* evidence.

¶ 45 That brings us to the question of prejudice. We can quickly dispose of the State's only argument on this topic: defendant was not prejudiced by counsel's failure to offer Ebler's arson conviction because it was cumulative evidence. It was cumulative, the State says, since Ebler's conviction for possession of a controlled substance was in evidence. So was the fact that he was a gang member.

¶ 46 We firmly reject that argument. For starters, Ebler's narcotics conviction was admitted for impeachment purposes, not as *Lynch* evidence. And more importantly, it was not relevant at all to the factual dispute in this case. Possession of narcotics is not evidence of a violent propensity of any kind, much less a propensity to commit arson. The fact that Ebler was a gang member isn't evidence of that propensity, either. Since none of this evidence had the same relevance as Ebler's arson conviction, or for that matter, any meaningful probative value at all on the issue of self-defense, the arson conviction was not cumulative.

¶ 47 To establish prejudice, defendant must demonstrate a reasonable probability that the verdict(s) would have been different if counsel had offered Ebler's arson conviction as *Lynch* evidence. See *Strickland*, 466 U.S. at 694. A reasonable probability is "significantly less" than a preponderance of the evidence; it merely requires that "a verdict of not guilty would be reasonable" when the missing *Lynch* evidence is considered for what it is worth. (Citations and

quotation marks omitted.) *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45. Put simply, counsel's error must "undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694.

¶ 48    The trial court acquitted defendant of first-degree murder (and attempted murder) and convicted him of second-degree murder (and aggravated battery) because it found that he acted on a sincere but unreasonable belief that self-defense was necessary and justified. That finding alone settles one key element of a self-defense claim, the subjective-belief element; and it entails, obviously enough, that the trial court found defendant generally credible on the witness stand. In other words, the trial court clearly did not believe the State's theory that the shooting was a general act of vengeance; it believed that *defendant* believed he was acting in self-defense but did not find that belief objectively reasonable.

¶ 49    So our question pertains to the objective element of self-defense: in light of the *Lynch* evidence, is there a reasonable probability that the trial court would have seen Ebler as the aggressor, trying to set fire to defendant's house, and thus found defendant's belief not only credible and sincere, but "objectively reasonable" as well? *People v. Lee*, 213 Ill. 2d 218, 225 (2004); *People v. Robinson*, 375 Ill. App. 3d 320, 335 (2007) ("Self-defense has both a subjective aspect and an objective one ***.").

¶ 50    This inquiry turns on two questions. The first is the strength of the *Lynch* evidence that counsel failed to offer, that is, the extent of its probative value in the specific context of this case. For the reasons we have already explained, Ebler's prior conviction for arson, of all things, was highly probative on the disputed question of whether he was coming to set fire to defendant's house. This conviction makes it objectively more likely that defendant's version of the events was the correct one. And note that a belief can be reasonable, in the context of self-defense, even

if it falls short of being correct. *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 52.

¶ 51     The second question is the strength of the remaining evidence of self-defense: in a close case, it is all the more likely that counsel's error swung the verdicts against defendant. *People v. White*, 2011 IL 109689, ¶¶ 133-34.

¶ 52     And this was a very close case. Even apart from Ebler's arson conviction, there was significant evidence to support defendant's claim of reasonable self-defense. In the preceding three or four weeks, defendant's car had been burned. The front door of his house had been doused in gasoline and charred. Both incidents took place in the wee hours of the morning, between 3:00 and 4:30 a.m., and were documented in police reports. Ebler was arrested in connection with the arson of the house, though he was not charged.

¶ 53     On the day of the shooting, defendant testified, his girlfriend had been harassed and threatened by some people in a burgundy van. At 4:30 a.m.—note the timing—defendant saw a burgundy van drive through the alley behind his house, on the security camera that his parents installed after the first two ostensible arsons. When he went outside, he smelled gasoline and a "burning smell." He couldn't tell exactly what was burning, but it was, in fact, his other car, with kindling sticking out of the gas line and obvious fire damage. Another arson—though that hardly could have surprised defendant at this point.

¶ 54     Two men had walked up the street, toward the burning car, and then came back down the block, toward defendant's house, wearing ski masks. It would seem that one of them, most likely Ebler, had a can of gasoline in his hand. Though Ebler denied that the gasoline can found by the police was theirs, we note that it was found only feet away from the van that Ebler crawled under; that Ebler passed right through that spot on his way to the van; and that Acuna, who admittedly recanted all of his statements at trial, told the police that Ebler and Kuelbs had a

gasoline can when they left the van and planned to do "some gang shit" on defendant's block. Acuna also told the police that Ebler and Kuelbs pointed out defendant's car *and his house* when they arrived on the block, though Ebler denied that he knew which house was defendant's—or that he was involved in any arson at all against defendant.

¶ 55    At 4:30 a.m., against the backdrop of these recent events and the obvious "exigencies that existed at the moment" (*People v. White*, 87 Ill. App. 3d 321, 323 (1980)), defendant concluded that the two men at the edge of his property line were there to "finish what they started" by setting fire to his house again, and that he was therefore justified in using deadly force "to prevent *** the commission of a forcible felony." 720 ILCS 5/2-8, 7-1(a) (West 2022).

¶ 56    Although there are competing inferences that could reasonably be drawn on various factual questions, there is no doubt that defendant presented a plausible claim of self-defense that was supported by a significant amount of evidence in his favor. Add the fact that Ebler was a convicted arsonist—not just an uncharged suspect, as in the recent arsons—and it becomes all the more likely that he was, in fact, on the brink of another arson, as defendant believed. With this information, a trier of fact could reasonably acquit defendant on the basis of self-defense. Defendant was thus prejudiced by counsel's failure to offer this *Lynch* evidence.

¶ 57    We thus agree with defendant that his counsel's failure to introduce the prior arson conviction as *Lynch* evidence constituted ineffective assistance.

¶ 58    Because we have found that counsel was ineffective, we must determine whether a new trial would violate double jeopardy. *People v. Moore*, 2020 IL 124538, ¶ 53. And defendant raises the sufficiency of the evidence as an independent ground for reversal. In the context of a sufficiency challenge, we cannot consider Ebler's arson conviction, since it was not in evidence at trial. Taking all available trial evidence in the light most favorable to the State, and drawing all

reasonable inferences in its favor, we cannot say that *no* rational trier of fact could ever convict defendant of the mitigated and lesser offenses that the trial court found here. So we cannot go so far as to reverse his convictions outright under the demanding standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

¶ 59 But having found that a reasonable trier of fact could acquit defendant of all charges, when the *Lynch* evidence is thrown into the mix, we reverse his convictions and grant him a new trial. Double jeopardy precludes the State from retrying defendant on the charges of first-degree murder and attempted murder. *People v. Fort*, 2017 IL 118966, ¶ 34. We thus remand for a new trial on the charges of second-degree murder and aggravated battery with a firearm.

¶ 60                                   CONCLUSION

¶ 61 Defendant's convictions for second-degree murder and aggravated battery with a firearm are reversed. The cause is remanded for a new trial on these charges.

¶ 62 Reversed and remanded.